

MICHAEL D. WILSON
HILL RIVKINS LLP
Attorneys for Plaintiff
45 Broadway – Suite 1500
New York, NY 10006
(212) 669-0600

**10 CV 4477**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

TRICO MARINE OPERATORS, INC.,

Plaintiff,

- against -

OCEAN EXPRESS, LTD.,

Defendant.

10 CV _____

10 CV 4477

**VERIFIED COMPLAINT**

Plaintiff, Trico Marine Operators, Inc. ("Trico"), by and through its attorneys Hill Rivkins LLP, as and for its Verified Complaint against the above-named Defendant, alleges upon information and belief as follows:

**JURISDICTION**

1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and this Honorable Court has jurisdiction pursuant to 28 U.S.C. §1333.

**PARTIES**

2.    At and during all material times hereinafter mentioned, Plaintiff was and now is a business entity organized and existing by virtue of foreign law with an office and principal place of business at 10001 Woodloch Forest Drive, Suite 610, The Woodlands, Texas 77380.

3.    At and during all material times hereinafter mentioned, defendant Ocean Express, Ltd. ("Ocean Express") was and now is a business entity organized and existing by virtue of foreign law with an office and principal place of business at Pointe Noire, Congo.

4.    This action is brought to obtain jurisdiction over Defendant and to obtain security for any judgment or award that is eventually entered against it.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Breach of a Maritime Contract)

5.    Plaintiff repeats and re-alleges Paragraphs 1 through 4 as if set forth herein at length.

6.    On or about April 14, 2009, Trico, as owner, chartered the PSV OAK RIVER to Ocean Express, as charterer, on the SUPPLYTIME 2005 form ("the Oak Charter") with attached riders for a period of four (4) weeks with two (2) one-week options to extend on twenty-four hours notice. According to Boxes 20 through 23 of the Oak Charter, hire payments were to be made by Ocean Express at the rate of US $7,000 pdpr (per day pro rata), excluding certain charges and expenses, as per Trico's invoice instructions. Box 25 additionally set the interest rate payable by Ocean Express under the Oak Charter at 2% per month. A true and accurate copy of the Oak Charter is attached hereto as Exhibit 1.

7.    Pursuant to the Oak Charter, Trico delivered the PSV OAK RIVER to Ocean Express on the agreed date, fully capable of performing as described, and has otherwise fulfilled all of its duties and obligations under the Oak Charter.

8.      On or about June 1 and July 2, 2009, Trico invoiced Ocean Express for hire and maintenance allowance due under the Oak Charter for the periods of May 1 – 31, 2009 (No. 113188) and June 1 – 23, 2009 (No. 113325), in the amounts of $224,000.00 and $162,147.23, respectively.  Trico then issued a separate invoice (No. CM104706), deducting credits for fuel and lubes on board upon re-delivery of the PSV OAK RIVER in the amount of $33,666.89.  True and accurate copies of these invoices are attached hereto as Exhibit 2.

9.      Thereafter, Ocean Express provided Trico with a transfer order, dated October 29, 2009, indicating that a payment of $224,000.00 would be made to Trico in New York by Maritime Overseas on behalf of Ocean Express, presumably in satisfaction of Invoice No. 113188 for hire and maintenance allowance due under the Oak Charter for May 2009.  However, Trico never received the payment.  A true and accurate copy of the transfer order ("Ordre de Virement") is attached hereto as Exhibit 3.

10.     In sum, Ocean Express has failed to pay Trico a total of $352,480.34 under the Oak Charter, with interest accruing monthly at the rate of two percent (2%).

11.     Trico will shortly commence arbitration in London against Ocean Express to recover the unpaid hire, plus interest, pursuant to Box 34 and Clause 34(a) of the Oak Charter. Under English law, a prevailing party is normally awarded attorneys' fees and costs.


### AS AND FOR A SECOND CAUSE OF ACTION
**(Breach of a Maritime Contract)**

12.     Plaintiff repeats and re-alleges Paragraphs 1 through 11 as if set forth herein at length.

3

13.     On or about June 6, 2009, Trico, as owner, chartered the PSV BIG BLUE RIVER to Ocean Express, as charterer, on the SUPPLYTIME 89 form ("the Blue Charter") with attached riders for a period of five (5) days firm with three (3) one-day options to extend on 24 hours notice.  According to Boxes 19 - 22 of the Blue Charter, hire payments were to be made by Ocean Express at the rate of US $6,500.00 per day, excluding certain charges and expenses, as per Trico's invoice instructions.  Box 24 additionally set the interest rate payable by Ocean Express under the Blue Charter at 2% per month.  A true and accurate copy of the Blue Charter is attached hereto as Exhibit 4.

14.     Pursuant to the Blue Charter, Trico delivered the PSV BIG BLUE RIVER to Ocean Express on the agreed date, fully capable of performing as described, and has otherwise fulfilled all of its duties and obligations under the Blue Charter.

15.     On or about July 2, 2009, Trico invoiced Ocean Express for hire and maintenance allowance due under the Blue Charter for the period of June 8 - 12, 2009 (No. 113323) in the amounts of $29,665.29.  Trico then issued a separate invoice (No. CM104712), deducting credits for fuel and lubes on board upon re-delivery of the PSV BIG BLUE RIVER in the amount of $6,063.12.  True and accurate copies of these invoices are attached hereto as Exhibit 5.

16.     In sum, Ocean Express has failed to pay Trico a total of $23,602.17 under the Blue Charter, with interest accruing monthly at the rate of two percent (2%).

17.     Trico will shortly commence arbitration in London against Ocean Express to recover the unpaid hire, plus interest, pursuant to Box 33 and Clause 31(a) of the Blue Charter. Under English law, a prevailing party is normally awarded attorneys' fees and costs.

18.    The total now due and owing Trico under the Oak and Blue Charters can be calculated as follows:

| | |
|---|---|
| Unpaid Hire (Oak) | $352,480.34 |
| Unpaid Hire (Blue) | $23,602.17 |
| Est. Interest (Oak) | $85,500.00 |
| Est. Interest (Blue) | $5,700.00 |
| Est. Costs/Fees | $50,000.00 |
| **Total** | **$517,282.51** |

19.    After due investigation, Plaintiff respectfully submits that Ocean Express cannot be "found" in this District for purposes of and as delineated in Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

20.    According to the above-mentioned transfer order, at least one hire payment was to be made on behalf of Ocean Express by Maritime Overseas, which, upon belief, is a New York business corporation located at 666 Third Avenue, 4th Floor, New York, NY 10017. Plaintiff is thus informed that Defendant has, or will shortly have, assets, including but not limited to, cash, funds, escrow funds, credits, accounts, letters of credit, freights, sub-freights, charter hire and sub-charter hire, within this District, at or being held by Maritime Overseas and/or any other garnishee as further investigation may uncover.

21.    There is no statutory or maritime bar to the attachment sought herein.

**W H E R E F O R E**, plaintiff Trico Marine Operators, Inc. prays:

1.    That process in due form of law according to the practice of this Court may issue against defendant Ocean Express, Ltd., citing it to appear and answer the foregoing, failing

which, a default will be taken against Defendant for the principal amount of the claim, plus interest, costs and attorneys' fees;

2.     That if Defendant cannot be "found" within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, that all assets of Defendant up to and including **$517,282.51** be restrained and attached, including but not limited to cash, funds, escrow funds, credits, accounts, letters of credit, freights, sub-freights, charter hire, sub-charter hire, within this District, at or being held by Maritime Overseas and/or any other garnishee upon who a Writ of Maritime Attachment and Garnishment may be served;

3.     That this Court retain jurisdiction over this matter through the entry of judgment by the arbitration panel in London, so that judgment here may be entered in favor of Plaintiff for the amount of its claim, i.e., **$517,282.51**; and

4.     And for such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       June 7, 2010

HILL RIVKINS LLP, *Attorneys for*
Plaintiff Trico Marine Operators, Inc.

By: _____
       Michael D. Wilson
       45 Broadway, Suite 1500
       New York, New York 10006
       (212) 669-0600
       (212) 669-0699

## VERIFICATION

I, Michael D. Wilson, hereby affirm as follows:

1.     I am a member of Hill Rivkins LLP, attorneys for plaintiff Trico Marine
Operators, Inc.

2.     I have prepared and read the foregoing Verified Complaint and know the contents
thereof and, the same is true to the best of my knowledge, information and belief.

3.     The sources of my knowledge, information and belief are documents provided by
our clients and our discussions with them.

4.     As Plaintiff is a foreign business entity and none of its officers are located in the
Southern District of New York, this verification is made by me as counsel of
record.

I hereby affirm that the foregoing statements are true and correct.

Dated: New York, New York
       June 7, 2010

_____
Michael D. Wilson

# EXHIBIT 1

First issued 1975
Revised 1989 and 2005.

Printed by BIMCO's

Adopted by
International Support Vessel
Owners'
Association (ISOA), London

Copyright published by
BIMCO Copenhagen

**BIMCO**
TIME CHARTER PARTY FOR OFFSHORE SERVICE VESSELS
CODE NAME: SUPPLYTIME 2005                PART I

| | |
|---|---|
| 1. Place and date of contract<br>Barcelona, Spain, 14th April 2009 | |

| 2. Owners'/Place of business (full style, address, e-mail and fax no.)<br>Trico Marine Operators, Inc.<br>3200 Southwest Freeway, Suite 2950<br>Houston, TX 77027<br>USA | 3. Charterers/Place of business (full style, address, e-mail and fax no.)<br>Ocean Express<br>P.O. Box 646<br>Pointe Noire<br>CONGO |
|---|---|

| 4. Vessel's name and IMO number (ANNEX A)<br>PSV 'Oak River' | 5. Date of delivery (Cl. 2(a) and (c))<br>22nd April 2009 | 6. Cancelling date (Cl. 2(a) and (c))<br>As per box 5 |
|---|---|---|

| 7. Port or Place of delivery (Cl. 2(a))<br>Pointe Noire, Offshore clearances for Charterers' account. | 8. Port or place redelivery/notice of redelivery (Cl. 2(d))<br>(i) Port or place of redelivery<br>Pointe Noire, Offshore or agreed West African port, clearances for Charterers' account.<br>(ii) Number of days' notice of redelivery |
|---|---|

| 9. Period of hire (Cl. 1(a))<br>4 weeks | 10. Extension of period of hire (optional) (Cl. 1(b))<br>(i) Period of extension<br>2 x 1 week options<br>(ii) Advance notice for declaration of option (days)<br>24 hours |
|---|---|

| 11. Automatic extension period to complete voyage or well (Cl. 1(c))<br>(i) Voyage or well (state which)<br>Voyage<br>(ii) Maximum extension period (state number of days) | 12. Mobilisation charge (Cl. 2(b)(i))<br>(i) Lump sum<br>Nil<br>(ii) When due |
|---|---|

| 13. Early termination of charter (state amount of hire payable) (Cl. 31(a))<br>(i) State yes, if applicable<br>Any balance of the firm period outstanding at time of cancellation.<br>(ii) If yes, state amount of hire payable | 14. Number of days' notice of early termination (Cl. 31(a))<br>Not applicable | 15. Demobilisation charge (lump sum) (Cl. 2(e)) and (Cl. 31 (a))<br>Nil |
|---|---|---|

| 16. Area of operation (Cl. 6(a))<br>West Africa coast | 17. Employment of vessel restricted to (state nature of services(s)) (Cl. 6(a))<br>General supply duties offshore West Africa, as directed by Charterers but always within the classification and safe capacities / capabilities of vessel and Crew. |
|---|---|

| 18. Specialist operations  (Cl. 6(a))<br>(i) State if vessel may be used for ROV operations<br><br>(ii) State if vessel may be employed as a diving platform | 19. Bunkers (Cl. 10)<br>(i) Quantity of bunkers on delivery and redelivery<br><br>(ii) Price of bunkers on delivery<br><br>(iii) Price for bunkers on redelivery<br><br>(iv) Fuel specifications and grades for fuel supplied by Charterers |
|---|---|

| 20. Charter hire (state rate and currency) (Cl. 12(a) , (d) and (g))<br>7,000 USD pdpr excluding fuel oil, lubricants, water, port charges, pilotage, agency fees, temporary importation, local registration fees, local seaman (if required), community levies and any costs associated with local regulations, all local taxes, withholding tax, VAT and all other regulations as per clause 9, part II. | 21. Extension hire (if agreed, state rate) (Cl 12(b))<br>As per box 20 |
|---|---|

| 22. Invoicing for hire and other payments (Cl 12(d))<br>(i) State whether to be issued in advance or arrears<br>Arrears<br>(ii) State by whom to be issued if other than the party stated in Box 2<br>Not applicable<br>(iii) State to whom to be issued if addressee other than stated in Box 3<br>Not applicable | 23. Payments (state mode and place of payment; also state beneficiary and bank account ) (Cl 12(e))<br>As per invoice instructions. |
|---|---|

continued

Supplytime 2005 Time Charter Party for Offshore Service Vessels

PART I

| 24. Payment of hire, bunker invoices and disbursements for Charterers' account (state maximum number of days) (Cl. 12(e)) | | 25. Interest rate payable (Cl. 12(e)) | 26. Maximum audit period (Cl. 12(c)) |
|---|---|---|---|
| 30 days | | 2 % per month | 1 year |

| 27. Meals (state rate agreed) (Cl. 6(c)(i)) | 28. Accommodation (state rate agreed) (Cl. 6(c)(i)) | 29. Sublet (state amount of daily increment of charter hire) (Cl. 20) |
|---|---|---|
| | | |

**30. War Cancellation (indicate countries agreed) (Cl. 23)**

**31. General Average (Place of settlement – only to be filled in if other than London) (Cl. 26)**

**32. Taxes (Payable by Owners) (Cl. 30)**

**33. Breakdown (State period) (Cl. 31(b)(v))**

**34. Dispute resolution (state (a), (b) or (c) of Cl. 34, as agreed; if (c) agreed also state Place of Arbitration) (Cl. 34)**
(a)

**35. Numbers of additional clauses covering special provisions, if agreed**

It is mutually agreed that this Contract shall be performed subject to the conditions contained in the Charter consisting of PART I, including additional clauses, if any agreed and stated in Box 35, and PART II as well as ANNEX "A" and ANNEX "B" as annexed to this Charter. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II and ANNEX "A" and ANNEX "B" to the extent of such conflict but no further.

| Signature (Owners) Trico Marine Operators, Inc. | Signature (Charterers) Ocean Express |
|---|---|
| | N. Bagini    OCEAN EXPRESS |
| | B P 646 · POINTE-NOIRE |
| | Tél. 583 77 00 |
| | REPUBLIQUE DU CONGO |

ANNEX "A" to Time Charter Party for Offshore Service Vessels
Code Name: SUPPLYTIME 2005



VESSEL SPECIFICATION

# TRICO MARINE

www.tricomarine.com

## SUPPLY VESSEL // M/V OAK RIVER





M/V Oak River

| REGISTRATION | |
| --- | --- |
| Operator | Trico Marine Operators, Inc. |
| Official Number | D561108 |
| Builder | Quality Equipment |
| Flag | USA |
| Delivered | |
| Classification | ABS-Hull & Mach Class |
| | USCG |
| Gross Tonnage | 1,288 |
| Net Tonnage | 264 |
| Int'l Gross Ton | 723 |
| Int'l Net Ton | 216 |

| DIMENSIONS | |
| --- | --- |
| Length | 185' |
| Beam | 38' |
| Depth | 15' |
| Light Draft | |
| Maximum Draft | 13' |
| Clear Deck Area | |
| Boarded Deck Area | 113'2" x 28'10" |

| CAPACITIES | |
| --- | --- |
| Deck Cargo | 640 long tons |
| Cargo Fuel | 78,053 gals. |
| Pot./Ballast Water | 168,050 gals. |
| Bulk Mud | 24,000 cu ft |
| No. Tanks | 6 |
| Liquid Mud | 1,288 bbls. |
| No. Tanks | 2 |

| MACHINERY | |
| --- | --- |
| Main Engines | Two (2) EMD 16-567-BC |
| | HP - 3,320 |
| Reduction Gears | Lufkin RHS 2120C 3.17:1 |
| | Lufkin RHS 2120C 3.17:1 |
| Generators | Two (2) Kw 75 Detroit GM 671 |
| Bow Thruster | Two (2) GM 330 hp Twin Disc |

| ACCOMMODATIONS | |
| --- | --- |
| Certified to Carry | 22 Persons |
| State Rooms | 7 |
| Berths | (22) |
| Cooler/Freezer | Walk-in |

| NAVIGATION / COMMUNICATION | |
| --- | --- |
| Radars | One (1) Furuno 7040D Stbd. |
| | One (1) Furuno 7100D Port |
| Radios | Two (2) VHF Unitec MC410/MC490 |
| Fathometer | Furuno FMV-601 |
| GPS | Furuno Navigator |
| Loudhailer | Sea Hail |
| GMDSS | SSEA 300-93 |
| NECODER | 322AR |
| COMPASS | Ritchie |
| EPIRB | ACR 406 |

This specification is preliminary and subject to change without notice. Exact tank capacities, deadweight, deck cargo capacity and other figures that have been calculated and may change when the actual vessel is delivered.

SUPPLY VESSEL // M/V OAK RIVER

ANNEX "B" to Time Charter Party for Offshore Service Vessels
Code Name: SUPPLYTIME 2005



# INSURANCE

Insurance policies (as applicable) to be procured and
maintained by the Owners under Clause 17:

(1) <u>Marine Hull Insurance.</u> – Hull and Machinery Insurance shall be provided with limits equal to those normally carried by the Owners for the
Vessel.

(2) Protection and Indemnity (Marine Liability Insurance. –
Protection and Indemnity (P&I) or Marine Liability Insurance with coverage equivalent to the cover provided by members of the International
Group Protection and Indemnity Associations with a limit of cover no less than USD          for any one event.  The cover shall include liability
for collision and damage to fixed and floating objects to the extent not covered by the insurance in (1) above.

(3) <u>General Third Party Liability Insurance.</u> – To the extent not covered by the insurance in (2) ABOVE, Coverage shall be for:
Bodily Injury          per person
Property Damage          per occurrence.

(4) <u>Workmen's Compensation and Employer's liability Insurance for Employees.</u> –
To the extent not covered in the insurance in (2) above, covering Owners' employees and other persons for whom Owners are liable as
employer pursuant to applicable law for statutory benefits as set out and required by local law in area of operation or area in which the Owners
may become legally obliged to pay benefits.

(5) (Comprehensive General Automobile Liability Insurance. –
Covering all owned, hired and non-owned vehicles, coverage shall be for:
Bodily Injury          According to the local law.
Property Damage          In an amount equivalent to
single limit per occurrence.

(6) Such other insurances as may be agreed.



This computer generated form is printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document, which is not
clearly visible, the original BIMCO approved document shall apply. BIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO document and this document

PART II
## SUPPLYTIME 2005 Time Charter Party for Offshore Service Vessels

**Definitions** 1

"Owners" shall mean the party stated in Box 2 2

"Charterers" shall mean the party stated in Box 3 3

"Vessel" shall mean the vessel named in Box 4 and with particulars stated in ANNEX "A" 4 / 5

"Well" shall mean the time required to drill, test, complete and/or abandon a single borehole including any side-track thereof. 6 / 7 / 8

"Offshore Unit" shall mean any vessel, offshore installation, structure and/or mobile unit used in offshore exploration, construction, pipe-laying or repair, exploitation or production. 9 / 10 / 11

"Employees" shall mean employees, directors, officers, servants, agents or invitees. 12 / 13 / 14

1. **Charter Period** 15
(a)   The Owners let and the Charterers hire the Vessel for the period as stated in Box 9 from the time the Vessel is delivered to the Charterers. 16 / 17 / 18
(b)   Subject to Clause 12(b), the Charterers have the option to extend the Charter Period in direct continuation for the period stated in Box 10(i), but such an option must be declared in accordance with Box 10(ii). 19 / 20 / 21 / 22
(c)   The Charter Period shall automatically be extended for the time required to complete the voyage or well (whichever is stated in Box 11(i)) in progress, such time not to exceed the period stated in Box 11(ii). 23 / 24 / 25 / 26

2. **Delivery and Redelivery** 27
(a)   Delivery. - Subject to Clause 2(b) the Vessel shall be delivered by the Owners free of cargo and with clean tanks at any time between the date stated in Box 5 and the date stated in Box 6 at the port or place stated in Box 7 where the Vessel can safely lie always afloat. 28 / 29 / 30 / 31 / 32
(b)   Mobilisation. – 33
(i)    The Charterers shall pay a lump sum mobilisation charge as stated in Box 12 without discount. 34 / 35
(ii)   Should the Owners agree to the Vessel loading and transporting cargo and/or undertaking any other service for the Charterers en route to the port of delivery or from the port of delivery, then all terms and conditions of this Charter Party shall apply to such loading and transporting and/or other service exactly as if performed during the Charter Period excepting only that any lump sum freight agreed in respect thereof shall be payable and earned on shipment or commencement of the service as the case may be, the Vessel and/or goods lost or not lost. 36 / 37 / 38 / 39 / 40 / 41 / 42 / 43 / 44 / 45 / 46 / 47
(c)   Cancelling. - If the Vessel is not delivered by midnight local time on the cancelling date stated in Box 6, the Charterers shall be entitled to cancel this Charter Party. However, if the Owners will be unable to deliver the Vessel by the cancelling date, they may give notice in writing to the Charterers at any time prior to the delivery date as stated in Box 5 and shall state in such notice the date by which they will be able to deliver the Vessel. The Charterers may within 24 hours of receipt of such notice give notice in writing to the Owners cancelling this Charter Party. If the Charterers do not give such notice, then the later date specified in the Owners' notice shall be substituted for the cancelling date for all the purposes of this Charter Party. In the event the Charterers cancel the Charter Party, it shall terminate on terms that neither party shall be liable to the other for any losses incurred by reason of the non-delivery of the Vessel or the cancellation of the Charter Party. 48 / 49 / 50 / 51 / 52 / 53 / 54 / 55 / 56 / 57 / 58 / 59 / 60 / 61 / 62 / 63 / 64 / 65
(d)   Redelivery. - The Vessel shall be redelivered on the expiration or earlier termination of this Charter Party 66 / 67

free of cargo and with clean tanks at the port or place as stated in Box 6(i) or such other port or place as may be mutually agreed. The Charterers shall give not less than the number of days notice in writing of their intention to redeliver the Vessel, as stated in Box 8(ii). 68 / 69 / 70 / 71 / 72
(e)   Demobilisation. - The Charterers shall pay a lump sum demobilisation charge without discount in the amount as stated in Box 15 which amount shall be paid on the expiration or on earlier termination of this Charter Party. 73 / 74 / 75 / 76

3. **Condition of Vessel** 77
(a)   The Owners undertake that at the date of delivery under this Charter Party the Vessel shall be of the description and Class as specified in ANNEX "A", attached hereto, and in a thoroughly efficient state of hull and machinery. 78 / 79 / 80 / 81 / 82
(b)   The Owners shall exercise due diligence to maintain the Vessel in such Class and in every way fit for the service stated in Clause 6 throughout the period of this Charter Party. 83 / 84 / 85 / 86

4. **Structural Alterations and Additional Equipment** 87
The Charterers shall, at their expense, have the option of making structural alterations to the Vessel or installing additional equipment with the written consent of the Owners, which shall not be unreasonably withheld. Unless otherwise agreed, the Vessel is to be redelivered reinstated, at the Charterers' expense, to her original condition. The Vessel is to remain on hire during any period of these alterations or reinstatement. The Charterers shall at all times be responsible for repair and maintenance of any such alteration or additional equipment. However, the Owners may, upon giving notice, undertake any such repair and maintenance at the Charterers' expense, when necessary for the safe and efficient performance of the Vessel. 88 / 89 / 90 / 91 / 92 / 93 / 94 / 95 / 96 / 97 / 98 / 99 / 100 / 101

5. **Survey** 102
The Owners and the Charterers shall jointly appoint an independent surveyor for the purpose of determining and agreeing in writing, the condition of the Vessel, any anchor handling and towing equipment specified in ANNEX "A", and the quality and quantity of fuel, lubricants and water at the time of delivery and redelivery hereunder. The Owners and the Charterers shall jointly share the time and expense of such surveys. 103 / 104 / 105 / 106 / 107 / 108 / 109 / 110

6. **Employment and Area of Operation** 111
(a)   The Vessel shall be employed in offshore activities which are lawful in accordance with the law of the place of the Vessel's flag and/or registration and of the place of operation. Such activities shall be restricted to the service(s) as stated in Box 17, and to voyages between any good and safe port or place and any place or offshore unit where the Vessel can safely lie always afloat within the Area of Operation as stated in Box 16 which shall always be within International Navigation Limits and which shall in no circumstances be exceeded without prior agreement and adjustment of the Hire and in accordance with such other terms as appropriate to be agreed; provided always that the Charterers do not warrant the safety of any such port or place or offshore unit but shall exercise due diligence in issuing their orders to the Vessel as if the Vessel were their own property and having regard to her capabilities and the nature of her employment. 112 / 113 / 114 / 115 / 116 / 117 / 118 / 119 / 120 / 121 / 122 / 123 / 124 / 125 / 126 / 127 / 128 / 129
Unless otherwise stated in Box 18(i), the Charterers shall not have the right to use the Vessel for ROV operations. Unless otherwise stated in Box 18(ii), the Vessel shall not be employed as a diving platform. 130 / 131 / 132 / 133

This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.



PART II

SUPPLYTIME 2005 Time Charter Party for Offshore Service Vessels

(b)  Relevant permission and licences from responsible
authorities for the Vessel to enter, work in and leave
the Area of Operation shall be obtained by the
Charterers and the Owners shall assist, if necessary,
in every way possible to secure such permission and
licences.                                                                                134
                                                                                            135
                                                                                            136
                                                                                            137
                                                                                            138

(c)  The Vessel's Space. - The whole reach and burden
and decks of the Vessel shall throughout the Charter
Period be at the Charterers' disposal reserving proper
and sufficient space for the Vessel's Master, Officers,
Crew, tackle, apparel, furniture, provisions and stores.
The Charterers shall be entitled to carry, so far as space
is available and for their purposes in connection with
their operations:                                                                   139
                                                                                            140
                                                                                            141
                                                                                            142
                                                                                            143
                                                                                            144
                                                                                            145
                                                                                            146

(i)  Persons other than crew members, other than fare
paying, and for such purposes to make use of
the Vessel's available accommodation not being
used on the voyage by the Vessel's Crew. The
Owners shall provide suitable provisions and
requisites for such persons for which the
Charterers shall pay at the rate as stated in Box
27 per meal and at the rate as stated in Box 28
per day for the provision of bedding and services
for persons using berth accommodation.              147
                                                                                            148
                                                                                            149
                                                                                            150
                                                                                            151
                                                                                            152
                                                                                            153
                                                                                            154
                                                                                            155
                                                                                            156

(ii)  Lawful cargo whether carried on or under deck.      157

(iii)  Explosives and dangerous cargo whether in bulk
or packaged, provided proper notification has
been given and such cargo is marked and packed
in accordance with the national regulations of the
Vessel and/or the International Maritime Danger-
ous Goods Code and/or other pertinent regula-
tions. Failing such proper notification, marking or
packing the Charterers shall indemnify the Own-
ers in respect of any loss, damage or liability
whatsoever and howsoever arising therefrom. The
Charterers accept responsibility for any additional
expenses (including reinstatement expenses) in-
curred by the Owners in relation to the carriage
of explosives and dangerous cargo.                        158
                                                                                            159
                                                                                            160
                                                                                            161
                                                                                            162
                                                                                            163
                                                                                            164
                                                                                            165
                                                                                            166
                                                                                            167
                                                                                            168
                                                                                            169
                                                                                            170
                                                                                            171

(iv)  Hazardous or noxious substances, subject to
Clause 14(f), proper notification and any pertinent
regulations.                                                                      172
                                                                                            173
                                                                                            174

(d)  Laying-up of Vessel. - The Charterers shall have
the option of laying up the Vessel at an agreed safe
port or place for all or any portion of the Charter Period
in which case the Hire hereunder shall continue to be
paid but, if the period of such lay-up exceeds 30
consecutive days, there shall be credited against such
Hire the amount which the Owners shall reasonably
have saved by way of reduction in expenses and
overheads as a result of the lay-up of the Vessel.      175
                                                                                            176
                                                                                            177
                                                                                            178
                                                                                            179
                                                                                            180
                                                                                            181
                                                                                            182
                                                                                            183
                                                                                            184

7.   Master and Crew

(a)  (i)  The Master shall carry out his duties promptly
and the Vessel shall render all reasonable
services within her capabilities by day and by night
and at such times and on such schedules as the
Charterers may reasonably require without any
obligations of the Charterers to pay to the Owners
or the Master, Officers or the Crew of the Vessel
any excess or overtime payments. The Charterers
shall furnish the Master with all instructions and
sailing directions and the Master and Engineer
shall keep full and correct logs accessible to the
Charterers or their agents.                                        185
                                                                                            186
                                                                                            187
                                                                                            188
                                                                                            189
                                                                                            190
                                                                                            191
                                                                                            192
                                                                                            193
                                                                                            194
                                                                                            195
                                                                                            196

(ii) (1)  No Bills of Lading shall be issued for
shipments under this Charter Party.                          197
                                                                                            198

(2)  The Master shall sign cargo documents as
directed by the Charterers in the form of receipts      199
                                                                                            200
                                                                                            201

that are non-negotiable documents ar[...]
clearly marked as such.
(3)  The Charterers shall indemnify t[...]
against all liabilities that may arise fro[...]
of such cargo documents in accordance [...]
directions of the Charterers to the extent [...]
terms of such cargo documents impose n[...]
onerous liabilities than those assumed b[...]
Owners under the terms of this Charter Pa[...]

(b)  The Vessel's Crew if required by Charterers [...]
connect and disconnect electric cables, fuel, water [...]
pneumatic hoses when placed on board the Vessel [...]
port as well as alongside the offshore units; will ope[...]
the machinery on board the Vessel for loading and [...]
unloading cargoes; and will hook and unhook cargo o[...]
board the Vessel when loading or discharging alongsi[...]
offshore units. If the port regulations or the seamen an[...]
or labour unions do not permit the Crew of the Vessel t[...]
carry out any of this work, then the Charterers shall mak[...]
at their own expense, whatever other arrangements may [...]
be necessary, always under the direction of the Master.

(c)  If the Charterers have reason to be dissatisfied
with the conduct of the Master or any Officer or member
of the Crew, the Owners on receiving particulars of the
complaint shall promptly investigate the matter and if
the complaint proves to be well founded, the Owners
shall as soon as reasonably possible make appropriate
changes in the appointment.

(d)  The entire operation, navigation, and management
of the Vessel shall be in the exclusive control and
command of the Owners, their Master, Officers and
Crew. The Vessel will be operated and the services
hereunder will be rendered as requested by the
Charterers, subject always to the exclusive right of the
Owners or the Master of the Vessel to determine
whether operation of the Vessel may be safely [...]
[...] In the performance of the Charter Party,
[...] be deemed to be an independent
[...] the Charterers being concerned only with
[...] of the services performed.

8.   [...]
(a)  The Owners shall provide and pay for all
[...] wages and all other expenses of the Master,
[...] Crew; all maintenance and repair of the
[...] hull, machinery and equipment as specified in
[...] Box [...], except as otherwise provided in this
[...] ; for all insurance on the Vessel, unless
[...] specifically added to the Vessel's flag and
[...] deck, stores and engine room stores,
[...] for ordinary ship's purposes among
[...] labour, and all fumigation expenses and
[...] The Owners' obligation
[...] to cover all liabilities for crew
[...] in the Master, Officers and the
[...] disbursing at any time designate
[...] Charter Party in relation to the
[...] the Master, Officers and Crew and
[...] provisions and other matter
[...] the Charterers are to provide with
[...] related to the Owners'
[...] participants may have paid also
[...] respect of such liability.
[...] the Vessel shall be equipped
[...] Owners' expense and any tools and
[...] specified in ANNEX [...]

9.   [...]
[...] on hire the Charterers shall [...]

234
240
241
242
243
244
245
246
247
248
249
250
251
252
253
254
255
256
257
258
259
260
261
262
263
264
265
266
267
268

This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the
pre-printed text of this document which is not clearly visible, the text of the original SUPPLYTIME 2005 approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a
result of discrepancies between the original BIMCO approved document and this computer generated document.

NB

PART II
SUPPLYTIME 2005 Time Charter Party for Offshore Service Vessels

"The Charterers shall provide the Owners with 405
their full style contact details and, where sub- 406
letting is permitted under the terms of the charter 407
party, shall ensure that the contact details of all 408
sub-charterers are likewise provided to the 409
Owners". 410

(ii) Except as otherwise provided in this Charter Party, 411
loss, damages, expense or delay (excluding 412
consequential loss, damages, expense or delay) 413
caused by failure on the part of the Charterers to 414
comply with this Clause shall be for the Charterers' 415
account. 416

(c) Notwithstanding anything else contained in this 417
Charter Party all delay, costs or expenses whatsoever 418
arising out of or related to security regulations or 419
measures required by the port facility or any relevant 420
authority in accordance with the ISPS Code/MTSA 421
including, but not limited to, security guards, launch 422
services, tug escorts, port security fees or taxes and 423
inspections, shall be for the Charterers' account, unless 424
such costs or expenses result solely from the Owners' 425
negligence. All measures required by the Owners to 426
comply with the Ship Security Plan shall be for the 427
Owners' account. 428

(d) If either party makes any payment which is for the 429
other party's account according to this Clause, the other 430
party shall indemnify the paying party. 431

12. Hire and Payments 432

(a) Hire. - The Charterers shall pay Hire for the Vessel 433
at the rate stated in Box 20 per day or pro rata for part 434
thereof from the time that the Vessel is delivered to the 435
Charterers until the expiration or earlier termination of 436
this Charter Party. 437

(b) Extension Hire. - If the option to extend the Charter 438
Period under Clause 1(b) is exercised, Hire for such 439
extension shall, unless stated in Box 21, be agreed 440
between the Owners and the Charterers. Should the 441
parties fail to reach an agreement, then the Charterers' 442
shall not have the option to extend the Charter Period. 443

(c) Adjustment of Hire. - The rate of hire shall be 444
adjusted to reflect documented changes, after the date 445
of entering into the Charter Party or the date of 446
commencement of employment, whichever is earlier, 447
in the Owners' costs arising from changes in the 448
Charterers' requirements, or regulations governing the 449
Vessel and/or its Crew or this Charter Party or the 450
application thereof. 451

(d) Invoicing. - All invoices shall be issued in the 452
contract currency stated in Box 20. In respect of 453
reimbursable expenses incurred in currencies other than 454
the contract currency, the rate of exchange into the 455
contract currency shall be that quoted by the Central 456
Bank of the country of such other currency as at the 457
date of the Owners' invoice. Invoices covering Hire and 458
any other payments due shall be issued monthly as 459
stated in Box 22(i) or at the expiration or earlier 460
termination of this Charter Party. Notwithstanding the 461
foregoing, bunkers and lubricants on board at delivery 462
shall be invoiced at the time of delivery. 463

(e) Payment s. - Payments of Hire, bunker invoices 464
and disbursements for the Charterers' account shall be 465
received within the number of days stated in Box 24 466
from the date of receipt of the invoice. Payment shall 467
be made in the currency stated in Box 20 in full without 468
discount to the account stated in Box 23. 469
However, any advances for disbursements made on 470
behalf of and approved by the Owners may be deducted 471
from Hire due. 472

If payment is not received by the Owners within 5 473
banking days following the due date the Owners are 474
entitled to charge interest at the rate stated in Box 25 475
on the amount outstanding from and including the due 476
date until payment is received. 477

Where an invoice is disputed, the Charterers shall notify 478
the Owners before the due date and in any event pay 479
the undisputed portion of the invoice but shall be entitled 480
to withhold payment of the disputed portion provided 481
that such portion is reasonably disputed and the 482
Charterers specify such reason. Interest will be 483
chargeable at the rate stated in Box 25 on such disputed 484
amounts where resolved in favour of the Owners. 485
Should the Owners prove the validity of the disputed 486
portion of the invoice, balance payment should be received 487
by the Owners within 5 banking days after the dispute 488
is resolved. Should the Charterers' claim be valid, a 489
corrected invoice shall be issued by the Owners. 490

(f) (i) Where there is a failure to pay Hire by the due 491
date, the Owners shall notify the Charterers in 492
writing of such failure and further may also suspend 493
the performance of any or all of their obligations 494
under this Charter Party until such time as all the 495
Hire due to the Owners under the Charter Party 496
has been received by the Owners. Throughout any 497
period of suspended performance under this 498
Clause, the Vessel is to be and shall remain on 499
Hire. The Owners' right to suspend performance 500
under this Clause shall be without prejudice to any 501
other rights they may have under this Charter Party. 502

(ii) If after 5 days of the written notification referred 503
to in Clause 12(f)(i) the Hire has still not been 504
received the Owners may at any time while Hire 505
remains outstanding withdraw the Vessel from the 506
Charter Party. The right to withdraw is to be 507
exercised promptly and in writing and is not 508
dependent upon the Owners first exercising the 509
right to suspend performance of their obligations 510
under the Charter Party pursuant to Clause 12(f)(i) 511
above. The receipt by the Owners of a payment 512
from the Charterers after the five day period 513
referred to above has expired but prior to the 514
notice of withdrawal shall not be deemed a waiver 515
of the Owners' right to cancel the Charter Party. 516

(iii) Where the Owners choose not to exercise any of 517
the rights afforded to them by this Clause in 518
respect of any particular late payment of Hire, or 519
a series of late payments of Hire, under the 520
Charter Party, this shall not be construed as a 521
waiver of their right either to suspend performance 522
under Clause 12(f)(i) or to withdraw the Vessel 523
from the Charter Party under Clause 12(f)(ii) in 524
respect of any subsequent late payment under 525
this Charter Party. 526

(iv) The Charterers shall indemnify the Owners in 527
respect of any liabilities incurred by the Owners 528
under the Bill of Lading or any other contract of 529
carriage as a consequence of the Owners' proper 530
suspension of and/or withdrawal from any or all 531
of their obligations under this Charter Party. 532

(g) Audit. - The Charterers shall have the right to 533
appoint an independent chartered accountant to audit 534
the Owners' books directly related to work performed 535
under this Charter Party at any time after the conclusion 536
of the Charter Party, up to the expiry of the period stated 537
in Box 26, to determine the validity of the Owners' 538
charges hereunder. The Owners undertake to make 539
their records available for such purposes at their 540

This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

## PART II
### SUPPLYTIME 2005 Time Charter Party for Offshore Service Vessels

principal place of business during normal working hours. 541
Any discrepancies discovered in payments made shall 542
be promptly resolved by invoice or credit as appropriate. 543

13.  **Suspension of Hire** 544
  (a)  If as a result of any deficiency of Crew or of the 545
  Owners' stores, strike of Master, Officers and Crew, 546
  breakdown of machinery, damage to hull or other 547
  accidents to the Vessel, the Vessel is prevented from 548
  working, no Hire shall be payable in respect of any time 549
  lost and any Hire paid in advance shall be adjusted 550
  accordingly provided always however that Hire shall 551
  not cease in the event of the Vessel being prevented 552
  from working as aforesaid as a result of: 553
  (i)   the carriage of cargo as noted in Clause 6(c)(iii) 554
        and (iv); 555
  (ii)  quarantine or risk of quarantine unless caused by 556
        the Master, Officers or Crew having communication 557
        with the shore at any infected area not in 558
        connection with the employment of the Vessel 559
        without the consent or the instructions of the 560
        Charterers; 561
  (iii) deviation from her Charter Party duties or 562
        exposure to abnormal risks at the request of the 563
        Charterers; 564
  (iv)  detention in consequence of being driven into port 565
        or to anchorage through stress of weather or 566
        trading to shallow harbours or to river or ports 567
        with bars or suffering an accident to her cargo, 568
        when the expenses resulting from such detention 569
        shall be for the Charterers' account howsoever 570
        incurred; 571
  (v)   detention or damage by ice; 572
  (vi)  any act or omission of the Charterers, their 573
        servants or agents. 574
  (b)  Liability for Vessel not Working. – The Owners' 575
  liability for any loss, damage or delay sustained by the 576
  Charterers as a result of the Vessel being prevented 577
  from working by any cause whatsoever shall be limited 578
  to suspension of hire, except as provided in Clause 579
  11(a)(iii). 580
  (c)  Maintenance and Drydocking. – Notwithstanding 581
  Clause 13(a), the Charterers shall grant the Owners a 582
  maximum of 24 hours on hire, which shall be 583
  cumulative, per month or pro rata for part of a month 584
  from the commencement of the Charter Period for 585
  maintenance and repairs (hereinafter referred to as "maintenance allowance"). 586
  (hereinafter referred to as "maintenance allowance"). 587
  The Vessel shall be drydocked at regular intervals. The 588
  Charterers shall place the Vessel at the Owners' 589
  disposal clean of cargo, at a port (to be nominated by 590
  the Owners at a later date) having facilities suitable to 591
  the Owners for the purpose of such drydocking. 592
  During reasonable voyage time taken in transits 593
  between such port and Area of Operation the Vessel 594
  shall be on hire and such time shall not be counted 595
  against the accumulated maintenance allowance. 596
  Hire shall be suspended during any time taken in 597
  maintenance repairs and drydocking in excess of the 598
  accumulated maintenance allowance. 599
  In the event of less time being taken by the Owners for 600
  repairs and drydocking or, alternatively, the Charterers 601
  not making the Vessel available for all or part of this 602
  time, the Charterers shall, upon expiration or earlier 603
  termination of the Charter Party, pay the equivalent of 604
  the daily rate of Hire then prevailing in addition to Hire 605
  otherwise due under this Charter Party in respect of all 606
  such time not so taken or made available. 607
  Upon commencement of the Charter Period, the Owners 608

agree to furnish the Charterers with the Owners' 609
proposed drydocking schedule and the Charterers 610
agree to make every reasonable effort to assist the 611
Owners in adhering to such predetermined drydocking 612
schedule for the Vessel. 613

14.  **Liabilities and Indemnities** 614
  (a)  Definitions 615
  For the purpose of this Clause "Owners' Group" shall 616
  mean: the Owners, and their contractors and sub- 617
  contractors , and Employees of any of the foregoing. 618
  For the purpose of this Clause "Charterers' Group" shall 619
  mean: the Charterers, and their contractors, sub- 620
  contractors, co-venturers and customers (having a 621
  contractual relationship with the Charterers, always with 622
  respect to the job or project on which the Vessel is 623
  employed), and Employees of any of the foregoing. 624
  (b)  Knock for Knock 625
  (i)  Owners. – Notwithstanding anything else contained 626
       in this Charter Party excepting Clauses 6(c)(iii), 627
       9(b), 9(e), 9(f), 10(d), 11, 12(f)(iv), 14 (d), 15 (b), 628
       18(c), 26 and 27, the Charterers shall not be 629
       responsible for loss of or damage to the property 630
       of any member of the Owners' Group, including 631
       the Vessel, or for personal injury or death of any 632
       member of the Owners' Group arising out of or in 633
       any way connected with the performance of this 634
       Charter Party, even if such loss, damage, injury or 635
       death is caused wholly or partially by the act, 636
       neglect, or default of the Charterers' Group, and 637
       even if such loss, damage, injury or death is caused 638
       wholly or partially by unseaworthiness of any 639
       vessel; and the Owners shall indemnify, protect, 640
       defend and hold harmless the Charterers from any 641
       and against all claims, costs, expenses, actions, 642
       proceedings, suits, demands and liabilities 643
       whatsoever arising out of or in connection with such 644
       loss, damage, personal injury or death. 645
  (ii) Charterers. – Notwithstanding anything else 646
       contained in this Charter Party excepting Clause 647
       11, 15(a), 16 and 26, the Owners shall not be 648
       responsible for loss of, damage to, or any liability 649
       arising out of anything towed by the Vessel, any 650
       cargo laden upon or carried by the Vessel or her 651
       tow, the property of any member of the Charterers' 652
       Group , whether owned or chartered, including 653
       their Offshore Units, or for personal injury or death 654
       of any member of the Charterers' Group or of 655
       anyone on board anything towed by the Vessel, 656
       arising out of or in any way connected with the 657
       performance of this Charter Party, even if such 658
       loss, damage, liability, injury or death is caused 659
       wholly or partially by the act, neglect or default of 660
       the Owners' Group, and even if such loss, 661
       damage, liability, injury or death is caused wholly 662
       or partially by the unseaworthiness of any vessel; 663
       and the Charterers shall indemnify, protect, 664
       defend and hold harmless the Owners from any 665
       and against all claims, costs, expenses, actions, 666
       proceedings, suits, demands, and liabilities 667
       whatsoever arising out of or in connection with 668
       such loss, damage, liability, personal injury or 669
       death. 670
  (c)  Consequential Damages.– 671
  Neither party shall be liable to the other for any 672
  consequential damages whatsoever arising out of or in 673
  connection with the performance or non-performance 674
  of this Charter Party, and each party shall protect, defend 675
  and indemnify the other from and against all such claims 676

This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.



PART II
SUPPLYTIME 2005 Time Charter Party for Offshore Service Vessels

from any member of its Group as defined in Clause 14(a). 677

"Consequential damages" shall include, but not be limited to, loss of use, loss of profits, shut-in or loss of production and cost of insurance, whether or not foreseeable at the date of this Charter Party. 678 679 680 681 682

(d)    Limitations.- 683
Nothing contained in this Charter Party shall be construed or held to deprive the Owners or the Charterers, as against any person or party, including as against each other, of any right to claim limitation of liability provided by any applicable law, statute or convention, save that nothing in this Charter Party shall create any right to limit liability. Where the Owners or the Charterers may seek an indemnity under the provisions of this Charter Party or against each other in respect of a claim brought by a third party, the Owners or the Charterers shall seek to limit their liability against such third party. 684 685 686 687 688 689 690 691 692 693 694 695

(e)    Himalaya Clause.- 696
(i)    All exceptions, exemptions, defences, immunities, limitations of liability, indemnities, privileges and conditions granted or provided by this Charter Party or by any applicable statute, rule or regulation for the benefit of the Charterers shall also apply to and be for the benefit of the Charterers' parent, affiliated, related and subsidiary companies; the Charterers' contractors, sub-contractors, co-venturers and customers (having a contractual relationship with the Charterers, always with respect to the job or project on which the Vessel is employed) ; their respective Employees and their respective underwriters. 697 698 699 700 701 702 703 704 705 706 707 708

(ii)    All exceptions, exemptions, defences, immunities, limitations of liability, indemnities, privileges and conditions granted or provided by this Charter Party or by any applicable statute, rule or regulation for the benefit of the Owners shall also apply to and be for the benefit of the Owners' parent, affiliated, related and subsidiary companies, the Owners' contractors, sub-contractors, the Vessel, its Master, Officers and Crew, its registered owner, its operator, its demise charterer(s), their respective Employees and their respective underwriters. 709 710 711 712 713 714 715 716 717 718 719 720

(iii)    The Owners or the Charterers shall be deemed to be acting as agent or trustee of and for the benefit of all such persons and parties set forth above, but only for the limited purpose of contracting for the extension of such benefits to such persons and parties. 721 722 723 724 725 726

(f)    Hazardous or Noxious Substances. 727
Notwithstanding any other provision of this Charter Party to the contrary, the Charterers shall always be responsible for any losses, damages or liabilities suffered by the Owners' Group, by the Charterers, or by third parties, with respect to the Vessel or other property, personal injury or death, pollution or otherwise, which losses, damages or liabilities are caused, directly or indirectly, as a result of the Vessel's carriage of any hazardous or noxious substances in whatever form as ordered by the Charterers, and the Charterers shall defend, indemnify the Owners and hold the Owners harmless for any expense, loss or liability whatsoever or howsoever arising with respect to the carriage of hazardous or noxious substances. 728 729 730 731 732 733 734 735 736 737 738 739 740 741

15.    Pollution 742
(a)    Except as otherwise provided for in Clause 18(c)(iii), the Owners shall be liable for, and agree to indemnify, 743 744

defend and hold harmless the Charterers against all claims, costs, expenses, actions, proceedings, suits, demands and liabilities whatsoever arising out of actual or threatened pollution damage and the cost of cleanup or control thereof arising from acts or omissions of the Owners or their personnel which cause or allow discharge, spills or leaks from the Vessel, except as may emanate from cargo thereon or therein. 745 746 747 748 749 750 751 752

(b)    The Charterers shall be liable for and agree to indemnify, defend and hold harmless the Owners from all claims, costs, expenses, actions, proceedings, suits, demands, liabilities, loss or damage whatsoever arising out of or resulting from any other actual or threatened pollution damage, even where caused wholly or partially by the act, neglect or default of the Owners, their Employees, contractors or sub-contractors or by the unseaworthiness of the Vessel. 753 754 755 756 757 758 759 760 761

(c)    The Charterers shall, upon giving notice to the Owners or the Master, have the right (but shall not be obliged) to place on board the Vessel and/or have in attendance at the site of any pollution or threatened incident one or more Charterers' representative to observe the measures being taken by Owners and/or national or local authorities or their respective servants, agents or contractors to prevent or minimise pollution damage and to provide advice, equipment or manpower or undertake such other measures, at Charterers' risk and expense, as are permitted under applicable law and as Charterers believe are reasonably necessary to prevent or minimise such pollution damage or to remove the threat of pollution damage. 762 763 764 765 766 767 768 769 770 771 772 773 774 775

16.    Wreck Removal 776
If the Vessel becomes a wreck and is an obstruction to navigation and has to be removed by order of any lawful authority having jurisdiction over the area where the Vessel is placed or as a result of compulsory law, the Owners shall be liable for any and all expenses in connection with the raising, removal, destruction, lighting or marking of the Vessel. 777 778 779 780 781 782 783

17.    Insurance 784
(a)    (i)    The Owners shall procure and maintain in effect for the duration of this Charter Party, with reputable insurers, the Insurances set forth in ANNEX "B". Policy limits shall not be less than those indicated. Reasonable deductibles are acceptable and shall be for the account of the Owners. 785 786 787 788 789 790 791

(ii)    The Charterers shall upon request be named as co-insured. The Owners shall upon request cause insurers to waive subrogation rights against the Charterers (as encompassed in Clause 14(e)(ii)). Co-insurance and/or waivers of subrogation shall be given only insofar as these relate to liabilities which are properly the responsibility of the Owners under the terms of this Charter Party. 792 793 794 795 796 797 798 799

(b)    The Owners shall upon request furnish the Charterers with copies of certificates of insurance which provide sufficient information to verify that the Owners have complied with the insurance requirements of this Charter Party. 800 801 802 803 804

(c)    If the Owners fail to comply with the aforesaid insurance requirements, the Charterers may, without prejudice to any other rights or remedies under this Charter Party, purchase similar coverage and deduct the cost thereof from any payment due to the Owners under this Charter Party. 805 806 807 808 809 810

This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.



PART II
SUPPLYTIME 2005 Time Charter Party for Offshore Service Vessels

18.  Saving of Life and Salvage

(a)  The Vessel shall be permitted to deviate for the purpose of saving life at sea without prior approval of or notice to the Charterers and without loss of Hire provided however that notice of such deviation is given as soon as possible.

(b)  Subject to the Charterers' consent, which shall not be unreasonably withheld, the Vessel shall be at liberty to undertake attempts at salvage, it being understood that the Vessel shall be off-hire from the time she leaves port or commences to deviate and she shall remain off-hire until she is again in every way ready to resume the Charterers' service at a position which is not less favourable to the Charterers than the position at the time of leaving port or deviating for the salvage services. All salvage monies earned by the Vessel shall be divided equally between the Owners and the Charterers, after deducting the Master's, Officers' and Crew's share, legal expenses, value of fuel and lubricants consumed, Hire of the Vessel lost by the Owners during the salvage, repairs to damage sustained, if any, and any other extraordinary loss or expense sustained as a result of the salvage.

The Charterers shall be bound by all measures taken by the Owners in order to secure payment of salvage and to fix its amount.

(c)  The Owners shall waive their right to claim any award for salvage performed on property owned by or contracted to the Charterers, always provided such property was the object of the operation the Vessel was chartered for, and the Vessel shall remain on hire when rendering salvage services to such property. This waiver is without prejudice to any right the Vessel's Master, Officers and Crew may have under any title.

If the Owners render assistance to such property in distress on the basis of "no claim for salvage", then, notwithstanding any other provisions contained in this Charter Party and even in the event of neglect or default of the Owners, Master, Officers or Crew:

(i)   The Charterers shall be responsible for and shall indemnify the Owners against payments made, under any legal rights, to the Master, Officers and Crew in relation to such assistance.

(ii)  The Charterers shall be responsible for and shall reimburse the Owners for any loss or damage sustained by the Vessel or her equipment by reason of giving such assistance and shall also pay the Owners' additional expenses thereby incurred

(iii) The Charterers shall be responsible for any actual or potential spill, seepage and/or emission of any pollutant howsoever caused occurring within the offshore site and any pollution resulting therefrom wheresoever it may occur and including but not limited to the cost of such measures as are reasonably necessary to prevent or mitigate pollution damage, and the Charterers shall indemnify the Owners against any liability, cost or expense arising by reason of such actual or potential spill, seepage and/or emission.

(iv)  The Vessel shall not be off-hire as a consequence of giving such assistance, or effecting repairs under Clause 18(c)(ii), and time taken for such repairs shall not count against time granted under Clause 13(c).

(v)   The Charterers shall indemnify the Owners against any liability, cost and/or expense whatsoever in respect of any loss of life, injury,

damage or other loss to person or property howsoever arising from such assistance.

19.  Lien

The Owners shall have a lien upon all cargoes and equipment for all claims against the Charterers under this Charter Party and the Charterers shall have a lien on the Vessel for all monies paid in advance and not earned. The Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the Owners in the Vessel. Except as provided in Clause 14, the Charterers shall indemnify and hold the Owners harmless against any lien of whatsoever nature arising upon the Vessel during the Charter Period while she is under the control of the Charterers, and against any claims against the Owners arising out of the operation of the Vessel by the Charterers or out of any neglect of the Charterers in relation to the Vessel or the operation thereof. Should the Vessel be arrested by reason of claims or liens arising out of her operation hereunder, unless brought about by the act or neglect of the Owners, the Charterers shall at their own expense take all reasonable steps to secure that within a reasonable time the Vessel is released and at their own expense put up bail to secure release of the Vessel.

20.  Sublet and Assignment

(a)  Charterers. - The Charterers shall have the option of subletting, assigning or loaning the Vessel to any person or company not competing with the Owners, subject to the Owners' prior approval which shall not be unreasonably withheld, upon giving notice in writing to the Owners, but the original Charterers shall always remain responsible to the Owners for due performance of the Charter Party. The person or company taking such subletting, assigning or loan and their contractors and sub-contractors shall be deemed contractors of the Charterers for all the purposes of this Charter Party. The Owners make it a condition of such consent that additional Hire shall be paid as agreed between the Charterers and the Owners in Box 29, having regard to the nature and period of any intended service of the Vessel.

(b)  Owners. - The Owners may not assign or transfer any part of this Charter Party without the written approval of the Charterers, which approval shall not be unreasonably withheld. Approval by the Charterers of such subletting or assignment shall not relieve the Owners of their responsibility for due performance of the part of the services which is sublet or assigned.

21.  Substitute Vessel

The Owners shall be entitled at any time, whether before delivery or at any other time during the Charter Period, to provide a substitute vessel, subject to the Charterers' prior approval which shall not be unreasonably withheld.

22.  BIMCO War Risks Clause "CONWARTIME 2004"

(a)  For the purpose of this Clause, the words:

(i)   "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(ii)  "War Risks" shall include any actual, threatened or reported: war; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage;

This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.



## PART II
### SUPPLYTIME 2005 Time Charter Party for Offshore Service Vessels

blockades (whether imposed against all vessels 945
or imposed selectively against vessels of certain 946
flags or ownership, or against certain cargoes or 947
crews or otherwise howsoever); by any person, 948
body, terrorist or political group, or the Government 949
of any state whatsoever, which, in the reasonable 950
judgement of the Master and/or the Owners, may 951
be dangerous or are likely to be or to become 952
dangerous to the Vessel, her cargo, crew or other 953
persons on board the Vessel. 954

(b)   The Vessel, unless the written consent of the 955
Owners be first obtained, shall not be ordered to or 956
required to continue to or through, any port, place, area 957
or zone (whether of land or sea), or any waterway or 958
canal, where it appears that the Vessel, her cargo, crew 959
or other persons on board the Vessel, in the reasonable 960
judgement of the Master and/or the Owners, may be, 961
or are likely to be, exposed to War Risks. Should the 962
Vessel be within any such place as aforesaid, which 963
only becomes dangerous, or is likely to be or to become 964
dangerous, after her entry into it, she shall be at liberty 965
to leave it. 966

(c)   The Vessel shall not be required to load contraband 967
cargo, or to pass through any blockade, whether such 968
blockade be imposed on all vessels, or is imposed 969
selectively in any way whatsoever against vessels of 970
certain flags or ownership, or against certain cargoes 971
or crews or otherwise howsoever, or to proceed to an 972
area where she shall be subject, or is likely to be subject 973
to a belligerent's right of search and/or confiscation. 974

(d)   (i) The Owners may effect war risks insurance in 975
respect of the Hull and Machinery of the 976
Vessel and their other interests (including, but not 977
limited to, loss of earnings and detention, the crew 978
and their Protection and Indemnity Risks), and 979
the premiums and/or calls therefor shall be for 980
their account. 981

(ii)   If the Underwriters of such insurance should require 982
payment of premiums and/or calls because, 983
pursuant to the Charterers' orders, the Vessel is 984
within, or is due to enter and remain within, or pass 985
through any area or areas which are specified by 986
such Underwriters as being subject to additional 987
premiums because of War Risks, then the actual 988
premiums and/or calls paid shall be reimbursed 989
by the Charterers to the Owners at the same time 990
as the next payment of hire is due, or upon 991
redelivery, whichever occurs first. 992

(e)   If the Owners become liable under the terms of 993
employment to pay to the crew any bonus or additional 994
wages in respect of sailing into an area which is 995
dangerous in the manner defined by the said terms, 996
then the actual bonus or additional wages paid shall be 997
reimbursed to the Owners by the Charterers at the same 998
time as the next payment of hire is due, or upon 999
redelivery, whichever occurs first. 1000

(f)   The Vessel shall have liberty:- 1001
(i)   to comply with all orders, directions, recommen- 1002
dations or advice as to departure, arrival, routes, 1003
sailing in convoy, ports of call, stoppages, desti- 1004
nations, discharge of cargo, delivery, or in any 1005
other way whatsoever, which are given by the 1006
Government of the Nation under whose flag the 1007
Vessel sails, or other Government to whose laws 1008
the Owners are subject, or any other Government, 1009
body or group whatsoever acting with the power 1010
to compel compliance with their orders or direc- 1011
tions; 1012

(ii)   to comply with the order, directions or recommen- 1013
dations of any war risks underwriters who have 1014
the authority to give the same under the terms of 1015
the war risks insurance; 1016

(iii)   to comply with the terms of any resolution of the 1017
Security Council of the United Nations, the 1018
effective orders of any other Supranational body 1019
which has the right to issue and give the same, 1020
and with national laws aimed at enforcing the 1021
same to which the Owners are subject, and to 1022
obey the orders and directions of those who are 1023
charged with their enforcement; 1024

(iv)   to discharge at any other port any cargo or part 1025
thereof which may render the Vessel liable to 1026
confiscation as a contraband carrier; 1027

(v)   to call at any other port to change the crew or any 1028
part thereof or other persons on board the Vessel 1029
when there is reason to believe that they may be 1030
subject to internment, imprisonment or other 1031
sanctions. 1032

(g)   If in accordance with their rights under the 1033
foregoing provisions of this Clause, the Owners shall 1034
refuse to proceed to the loading or discharging ports, 1035
or any one or more of them, they shall immediately 1036
inform the Charterers. No cargo shall be discharged at 1037
any alternative port without first giving the Charterers 1038
notice of the Owners' intention to do so and requesting 1039
them to nominate a safe port for such discharge. Failing 1040
such nomination by the Charterers within 48 hours of 1041
the receipt of such notice and request, the Owners may 1042
discharge the cargo at any safe port of their own choice. 1043
(h)   If in compliance with any of the provisions of sub- 1044
clauses (b) to (g) of this Clause anything is done or not 1045
done, such shall not be deemed a deviation, but shall 1046
be considered as due fulfilment of this Charter Party. 1047

**23.   War Cancellation Clause 2004** 1048
Either party may cancel this Charter Party on the 1049
outbreak of war (whether there be a declaration of war 1050
or not) 1051
(a)   between any two or more of the following countries: 1052
the United States of America; Russia; the United 1053
Kingdom; France; and the People's Republic of China, 1054
or, 1055
(b)   between the countries stated in Box 30. 1056

**24.   BIMCO Ice Clause for Time Charter Parties** 1057
(a)   The Vessel shall not be obliged to force ice but, 1058
subject to the Owners' prior approval having due regard 1059
to its size, construction and class, may follow ice- 1060
breakers. 1061
(b)   The Vessel shall not be required to enter or remain 1062
in any icebound port or area, nor any port or area where 1063
lights, lightships, markers or buoys have been or are 1064
about to be withdrawn by reason of ice, nor where on 1065
account of ice there is, in the Master's sole discretion, 1066
a risk that, in the ordinary course of events, the Vessel 1067
will not be able safely to enter and remain at the port or 1068
area or to depart after completion of loading or 1069
discharging. If, on account of ice, the Master in his sole 1070
discretion considers it unsafe to proceed to, enter or 1071
remain at the place of loading or discharging for fear of 1072
the Vessel being frozen in and/or damaged, he shall 1073
be at liberty to sail to the nearest ice-free and safe place 1074
and there await the Charterers' instructions. 1075
(c)   Any delay or deviation caused by or resulting from 1076
ice shall be for the Charterers' account and the Vessel 1077
shall remain on-hire. 1078
(d)   Any additional premiums and/or calls required by 1079

This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.



**PART II**
**SUPPLYTIME 2005 Time Charter Party for Offshore Service Vessels**

the Vessel's underwriters due to the Vessel entering or | 1080
remaining in any icebound port or area, shall be for the | 1081
Charterers' account. | 1082

**25.  Epidemic/Fever** | 1083
The Vessel shall not be ordered to nor bound to enter | 1084
without the Owners' written permission any place where | 1085
fever or epidemics are prevalent or to which the Master, | 1086
Officers and Crew by law are not bound to follow the | 1087
Vessel. | 1088
Notwithstanding the terms of Clause 13, Hire shall be | 1089
paid for all time lost including any lost owing to loss of | 1090
or sickness to the Master, Officers, Crew or passengers | 1091
or to the action of the Crew in refusing to proceed to | 1092
such place or to be exposed to such risks. | 1093

**26.  General Average and New Jason Clause** | 1094
General Average shall be adjusted and settled in | 1095
London unless otherwise stated in Box 31, according | 1096
to York-Antwerp Rules, 1994. | 1097
Hire shall not contribute to General Average. Should | 1098
adjustment be made in accordance with the law and | 1099
practice of the United States of America, the following | 1100
provision shall apply: | 1101
"In the event of accident, danger, damage or disaster | 1102
before or after the commencement of the voyage, | 1103
resulting from any cause whatsoever, whether due to | 1104
negligence or not, for which, or for the consequence of | 1105
which, the Owners are not responsible, by statute, | 1106
contract or otherwise, the cargo, shippers, consignees | 1107
or owners of the cargo shall contribute with the Owners | 1108
in General Average to the payment of any sacrifices, | 1109
loss or expenses of a General Average nature that may | 1110
be made or incurred and shall pay salvage and special | 111`
charges incurred in respect of the cargo. | 1112
If a salving vessel is owned or operated by the Owners, | 1113
salvage shall be paid for as fully as if the said salving | 1114
vessel or vessels belonged to strangers. Such deposit | 1115
as the Owners, or their agents, may deem sufficient to | 1116
cover the estimated contribution of the cargo and any | 1117
salvage and special charges thereon shall, if required, | 1118
be made by the cargo, shippers, consignees or owners | 1119
of the cargo to the Owners before delivery". | 1120

**27.  Both-to-Blame Collision Clause** | 1121
If the Vessel comes into collision with another ship as a | 1122
result of the negligence of the other ship and any act, | 1123
neglect or default of the Master, mariner, pilot or the | 1124
servants of the Owners in the navigation or the | 1125
management of the Vessel, the Charterers will | 1126
indemnify the Owners against all loss or liability to the | 1127
other or non-carrying ship or her owners insofar as such | 1128
loss or liability represent loss of or damage to, or any | 1129
claim whatsoever of the owners of any goods carried | 1130
under this Charter Party paid or payable by the other or | 1131
non-carrying ship or her owners to the owners of the | 1132
said goods and set-off, recouped or recovered by the | 1133
other or non-carrying ship or her owners as part of their | 1134
claim against the Vessel or the Owners. The foregoing | 1135
provisions shall also apply where the owners, operators | 1136
or those in charge of any ship or ships or objects other | 1137
than or in addition to the colliding ships or objects are | 1138
at fault in respect of a collision or contact. | 1139

**28.  Health and Safety** | 1140
The Owners shall comply with and adhere to all | 1141
applicable international, national and local regulations | 1142
pertaining to health and safety, and such Charterers' | 1143
instructions as may be appended hereto. | 1144

**29.  Drugs and Alcohol Policy** | 1145
The Owners undertake that they have, and shall maintain | 1146
for the duration of this Charter Party, a policy on Drugs | 1147
and Alcohol Abuse applicable to the Vessel (the "D & A | 1148
Policy") that meets or exceeds the standards in the | 1149
OCIMF Guidelines for the Control of Drugs and Alcohol | 1150
Onboard Ship 1995 as amended from time to time. | 1151
The Owners shall exercise due diligence to ensure that | 1152
the D & A Policy is understood and complied with on | 1153
and about the Vessel. An actual impairment, shall not | 1154
in and itself mean that the Owners have failed to | 1155
exercise due diligence. | 1156

**30.  Taxes** | 1157
Within the day rate the Owners shall be responsible for | 1158
the taxes stated in Box 32 and the Charterers shall be | 1159
responsible for all other taxes. | 1160
In the event of change in the Area of Operation or | 1161
change in local regulation and/or interpretation thereof, | 1162
resulting in an unavoidable and documented change of | 1163
the Owners' tax liability after the date of entering into | 1164
the Charter Party or the date of commencement of | 1165
employment, whichever is the earlier, Hire shall be | 1166
adjusted accordingly. | 1167

**31.  Early Termination** | 1168
(a)  At Charterers' Convenience. - The Charterers may | 1169
terminate this Charter Party at any time by giving the | 1170
Owners written notice of termination as stated in Box | 1171
14, upon expiry of which, this Charter Party will | 1172
terminate. Upon such termination, Charterers shall pay | 1173
the compensation for early termination stated in Box | 1174
13 and the demobilisation charge stated in Box 15, as | 1175
well as Hire or other payments due under the Charter | 1176
Party up to the time of termination. Should Box 13 be | 1177
left blank, Clause 31(a) shall not apply. | 1178
(b)  For Cause. - If either party becomes informed of | 1179
the occurrence of any event described in this Clause | 1180
that party shall so notify the other party promptly in | 1181
writing and in any case within 3 days after such | 1182
information is received. If the occurrence has not ceased | 1183
within 3 days after such notification has been given, | 1184
this Charter Party may be terminated by either party, | 1185
without prejudice to any other rights which either party | 1186
may have, under any of the following circumstances: | 1187
(i)   Requisition. - If the government of the state of | 1188
registry and/or the flag of the Vessel, or any | 1189
agency thereof, requisitions for hire or title or | 1190
otherwise takes possession of the Vessel during | 1191
the Charter Period. | 1192
(ii)  Confiscation. - If any government, individual or | 1193
group, whether or not purporting to act as a | 1194
government or on behalf of any government, | 1195
confiscates, requisitions, expropriates, seizes or | 1196
otherwise takes possession of the Vessel during | 1197
the Charter Period (other than by way of arrest | 1198
for the purpose of obtaining security). | 1199
(iii) Bankruptcy. - In the event of an order being made | 1200
or resolution passed for the winding up, dissolu- | 1201
tion, liquidation or bankruptcy of either party (oth- | 1202
erwise than for the purpose of reconstruction or | 1203
amalgamation) or if a receiver is appointed or if it | 1204
suspends payment or ceases to carry on business. | 1205
(iv)  Loss of Vessel. - If the Vessel is lost or becomes | 1206
a constructive total loss, or is missing unless the | 1207
Owners promptly state their intention to provide, | 1208
and do in fact provide, within 14 days of the Vessel | 1209
being lost or missing, at the port or place from | 1210
which the Vessel last sailed (or some other | 1211

This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

PART II
SUPPLYTIME 2005 Time Charter Party for Offshore Service Vessels

mutually acceptable port or place) a substitute 1212
vessel pursuant to Clause 21. In the case of 1213
termination, Hire shall cease from the date the 1214
Vessel was lost or, in the event of a constructive 1215
total loss, from the date of the event giving rise to 1216
such loss. If the date of loss cannot be ascertained 1217
or the Vessel is missing, payment of Hire shall 1218
cease from the date the Vessel was last reported. 1219

(v) Breakdown. - If, at any time during the term of 1220
this Charter Party a breakdown of the Owners' 1221
equipment or Vessel result in the Owners being 1222
unable to perform their obligations hereunder for 1223
a period exceeding that stated in Box 33 and have 1224
not initiated reasonable steps within 48 hours to 1225
remedy the non-performance or provided a 1226
substitute vessel pursuant to Clause 21. 1227

(vi) Force Majeure. - If a force majeure condition as 1228
defined in Clause 32 prevents or hinders the 1229
performance of the Charter Party for a period 1230
exceeding 15 consecutive days from the time at 1231
which the impediment causes the failure to 1232
perform if notice is given without delay or, if notice 1233
is not given without delay, from the time at which 1234
notice thereof reaches the other party. 1235

(vii) Default. - If either party is in repudiatory breach 1236
of its obligations hereunder. 1237

Termination as a result of any of the above mentioned 1238
causes shall not relieve the Charterers of any obligation 1239
for Hire and any other payments. 1240

32. Force Majeure 1241
Neither party shall be liable for any loss, damage or 1242
delay due to any of the following force majeure events 1243
and/or conditions to the extent the party invoking force 1244
majeure is prevented or hindered from performing any 1245
or all of their obligations under this Charter Party, 1246
provided they have made all reasonable efforts to avoid, 1247
minimize or prevent the effect of such events and/or 1248
conditions: 1249

(a) acts of God; 1250
(b) any Government requisition, control, intervention, 1251
requirement or interference; 1252
(c) any circumstances arising out of war, threatened 1253
act of war or warlike operations, acts of terrorism, 1254
sabotage or piracy, or the consequences thereof; 1255
(d) riots, civil commotion, blockades or embargoes; 1256
(e) epidemics; 1257
(f) earthquakes, landslides, floods or other extraor- 1258
dinary weather conditions; 1259
(g) strikes, lockouts or other industrial action, unless 1260
limited to the Employees of the party seeking to invoke 1261
force majeure; 1262
(h) fire, accident, explosion except where caused by 1263
negligence of the party seeking to invoke force majeure; 1264
(i) any other similar cause beyond the reasonable 1265
control of either party. 1266

The party seeking to invoke force majeure shall notify 1267
the other party in writing within 2 working days of the 1268
occurrence of any such event/condition. 1269

33. Confidentiality 1270
All information or data provided or obtained in 1271
connection with the performance of this Charter Party 1272
is and shall remain confidential and not be disclosed 1273
without the prior written consent of the other party. The 1274
parties shall use their best efforts to ensure that such 1275
information shall not be disclosed to any third party by 1276
any of their sub-contractors, Employees and agents. 1277
This Clause shall not apply to any information or data 1278

that has already been published or is in the public 1279
domain. 1280
All information and data provided by a party is and shall 1281
remain the property of that party. 1282

34. BIMCO Dispute Resolution Clause 1283
*(a) This Charter Party shall be governed by and 1284
construed in accordance with English law and any 1285
dispute arising out of or in connection with this Charter 1286
Party shall be referred to arbitration in London in 1287
accordance with the Arbitration Act 1996 or any statutory 1288
modification or re-enactment thereof save to the extent 1289
necessary to give effect to the provisions of this Clause. 1290
The arbitration shall be conducted in accordance with 1291
the London Maritime Arbitrators Association (LMAA) 1292
Terms current at the time when the arbitration 1293
proceedings are commenced. 1294
The reference shall be to three arbitrators. A party 1295
wishing to refer a dispute to arbitration shall appoint its 1296
arbitrator and send notice of such appointment in writing 1297
to the other party requiring the other party to appoint its 1298
own arbitrator within 14 calendar days of that notice 1299
and stating that it will appoint its arbitrator as sole 1300
arbitrator unless the other party appoints its own 1301
arbitrator and gives notice that it has done so within the 1302
14 days specified. If the other party does not appoint its 1303
own arbitrator and give notice that it has done so within 1304
the 14 days specified, the party referring a dispute to 1305
arbitration may, without the requirement of any further 1306
prior notice to the other party, appoint its arbitrator as 1307
sole arbitrator and shall advise the other party 1308
accordingly. The award of a sole arbitrator shall be 1309
binding on both parties as if he had been appointed by 1310
agreement. 1311
Nothing herein shall prevent the parties agreeing in 1312
writing to vary these provisions to provide for the 1313
appointment of a sole arbitrator. 1314
In cases where neither the claim nor any counterclaim 1315
exceeds the sum of US$50,000 (or such other sum as 1316
the parties may agree) the arbitration shall be conducted 1317
in accordance with the LMAA Small Claims Procedure 1318
current at the time when the arbitration proceedings 1319
are commenced. 1320
* (b) This Charter Party shall be governed by and 1321
construed in accordance with Title 9 of the United States 1322
Code and the Maritime Law of the United States and 1323
any dispute arising out of or in connection with this 1324
Charter Party shall be referred to three persons at New 1325
York, one to be appointed by each of the parties hereto, 1326
and the third by the two so chosen; their decision or 1327
that of any two of them shall be final, and for the 1328
purposes of enforcing any award, judgement may be 1329
entered on an award by any court of competent 1330
jurisdiction. The proceedings shall be conducted in 1331
accordance with the rules of the Society of Maritime 1332
Arbitrators, Inc. 1333
In cases where neither the claim nor any counterclaim 1334
exceeds the sum of US$50,000 (or such other sum as 1335
the parties may agree) the arbitration shall be conducted 1336
in accordance with the Shortened Arbitration Procedure 1337
of the Society of Maritime Arbitrators, Inc. current at 1338
the time when the arbitration proceedings are 1339
commenced. 1340
* (c) This Charter Party shall be governed by and 1341
construed in accordance with the laws of the place 1342
mutually agreed by the parties and any dispute arising 1343
out of or in connection with this Charter Party shall be 1344
referred to arbitration at a mutually agreed place, subject 1345
to the procedures applicable there. 1346

This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.



## PART II
### SUPPLYTIME 2005 Time Charter Party for Offshore Service Vessels

(d)  Notwithstanding (a), (b) or (c) above, the parties may agree at any time to refer to mediation any difference and/or dispute arising out of or in connection with this Charter Party.

In the case of a dispute in respect of which arbitration has been commenced under (a), (b) or (c) above, the following shall apply:

(i)  Either party may at any time and from time to time elect to refer the dispute or part of the dispute to mediation by service on the other party of a written notice (the "Mediation Notice") calling on the other party to agree to mediation.

(ii)  The other party shall thereupon within 14 calendar days of receipt of the Mediation Notice confirm that they agree to mediation, in which case the parties shall thereafter agree a mediator within a further 14 calendar days, failing which on the application of either party a mediator will be appointed promptly by the Arbitration Tribunal ("the Tribunal") or such person as the Tribunal may designate for that purpose. The mediation shall be conducted in such place and in accordance with such procedure and on such terms as the parties may agree or, in the event of disagreement, as may be set by the mediator.

(iii)  If the other party does not agree to mediate, that fact may be brought to the attention of the Tribunal and may be taken into account by the Tribunal when allocating the costs of the arbitration as between the parties.

(iv)  The mediation shall not affect the right of either party to seek such relief or take such steps as it considers necessary to protect its interest.

(v)  Either party may advise the Tribunal that they have agreed to mediation. The arbitration procedure shall continue during the conduct of the mediation but the Tribunal may take the mediation timetable into account when setting the timetable for steps in the arbitration.

(vi)  Unless otherwise agreed or specified in the mediation terms, each party shall bear its own costs incurred in the mediation and the parties shall share equally the mediator's costs and expenses.

(vii)  The mediation process shall be without prejudice and confidential and no information or documents disclosed during it shall be revealed to the Tribunal except to the extent that they are disclosable under the law and procedure governing the arbitration.

*(Note: The parties should be aware that the mediation process may not necessarily interrupt time limits.)*

If Box 34 in PART I is not appropriately filled in, sub-clause 34(a) of this Clause shall apply.  Sub-clause (d) shall apply in all cases.

*\* Sub-clauses 34(a), 34(b) and 34(c) are alternatives; indicate alternative agreed in Box 34.*

35.  **Notices**
(a)  All notices given by either party or their agents to the other party or their agents in accordance with the provisions of this Charter Party shall be in writing.
(b)  For the purposes of this Charter Party, "in writing" shall mean any method of legible communication. A notice may be given by any effective means including, but not limited to, cable, telex, fax, e-mail, registered or recorded mail, or by personal service.

36.  **Headings**
The headings of this Charter Party are for identification only and shall not be deemed to be part hereof or be taken into consideration in the interpretation or construction of this Charter Party.

37.  **Severance**
If by reason of any enactment or judgement any provision of this Charter Party shall be deemed or held to be illegal, void or unenforceable in whole or in part, all other provisions of this Charter Party shall be unaffected thereby and shall remain in full force and effect.

38.  **Entire Agreement**
This Charter Party, including all Annexes referenced herein and attached hereto, is the entire agreement of the parties, which supersedes all previous written or oral understandings and which may not be modified except by a written amendment signed by both parties.

This document is a computer generated SUPPLYTIME 2005 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.



# EXHIBIT 2



# INLAND
### S E R V I C E S   L I M I T E D

(FOR AND ON BEHALF OF TRICO MARINE OPERATORS, INC.)

Ocean Express
P.O. BOX 646
Pointe Noire
Congo.
Attention: Accounting Manager

| | | |
|---|---|---|
| Invoice No.: | 113188 |
| Date: | June 1, 2009 |
| Ref: | "SUPPLYTIME 89" |

| DESCRIPTION | | | | DAY RATE USD | USD AMOUNT |
|---|---|---|---|---|---|
| Services rendered in the month of May 2009 by the Oak Rive | | | | | |
| From | 00:01 | Hours on | 1-May-09 | 7,000.00 | 217,000.00 |
| Through | 24:00 | Hours on | 31-May-09 | | |
| | 31.0000 | | | | |
| Maintenance Allowance for days worked in May (31 days) | | | | | |
| | 1.00000 Days | | | 7,000.00 | 7,000.00 |
| | | | | | 224,000.00 |

Wire Instructions.
Trico Marine Operators, Inc.
Nordea Bank Finland Plc - New York Branch
437 Madison Avenue
New York, NY 10022
Swift NDEAUS3N
ABA/Routing# 026010786
Account#7414473001

FOR AND ON BEHALF OF
TRICO MARINE OPERATORS, INC.

CONTROLLER

If any clarification is equired, Please contact
Grace Esi - (234) 803 97405r0 or by email gesi@cims-wa com
David Asher - (234) 805 7082672 or by email dasher@cimstricomarine.com
Tel: 234.1.462.0561 3/Fax 234.1.462.0564



 

**ADEPT AT ADAPTING**

3200 Southwest Freeway Suite 2950 Houston, TX 77027 USA

Ocean Express
P.O. BOX 646
Pointe Noire
Congo.
Attention: Accounting Manager

Invoice No.:  113325
Date:  July 2, 2009
Ref:  "SUPPLYTIME 89"

| DESCRIPTION | | | | DAY RATE USD | USD AMOUNT |
|---|---|---|---|---|---|
| Services rendered in the month of June 2009 by the Oak River | | | | | |
| From | 00:01 | Hours on | 1-Jun-09 | 7,000.00 | 156,916.67 |
| Through | 10:00 | Hours on | 23-Jun-09 | | |
| | 22.4167 | | | | |
| Maintenance Allowance for days worked in June (22.4167 days) | | | | | |
| | 0.74722 Days | | | 7,000.00 | 5,230.56 |
| | | | | | 162,147.23 |

Wire Instructions:
Trico Marine Operators, Inc.
Nordea Bank Finland Plc - New York Branch
437 Madison Avenue
New York, NY 10022
Swift:NDEAUS3N
ABA/Routing# 026010786
Account#7414473001

FOR AND ON BEHALF OF
TRICO MARINE OPERATORS, INC.

CONTROLLER

If any clarification is required, Please contact
Grace Esli - (234) 803 9740590 or by email gesli@cms-ws.com
David Asher - (234) 805 7082672 o- by email dasher@omatincomarine.com
Tel: 234-1-462-0993/Fax 234-1-462-0564





3200 Southwest Freeway Suite 2950 Houston, TX 77027 USA

Ocean Express
P.O. BOX 646
Pointe Noire
Congo.

Invoice No.: CM104706
Date:      JULY 3, 2009

| DESCRIPTION | USG | L/USG | LITRES | PRICE $/L | USD AMOUNT |
|---|---|---|---|---|---|
| Oak River charter commencing on April 22, 2009. | | | | | |
| To charge you for fuel on-board on April 22, 2009 at delivery of vessel at Pointe Noire at beginning of charter. | 12,540.29 | 3.785 | 47,465.00 | 1.1759 | 55,812.64 |
| Price per litre = 550 cfa (as per email attached ) | | | | | |
| Exchange rate as per bloomberg on June 24,2009 = 467.739 CFA/USD at 467.739/USD = $1.1758694 | | | | | |
| To charge you for lubes on-board on April 22, 2009 on delivery of vessel at Pointe Noire at beginning of charter. | 607.66 | 3.785 | 2,300.00 | 8.5660 | 19,701.80 |
| As per attached email . | | | | | |
| 1 Drum = 1781.73USD | | | | | |
| 208 LTR    1 Drum | | | | | |
| PRICE PER LITRE = $1781.73/208 | | | | | |
| 8.56600962 | | | | | |
| Total On-hire Charges | | | | | 75,514.44 |
| To credit you for Fuel on-board on June 23, 2009 on re-delivery of vessel at end of charter. | (21,297.00) | 3.785 | (80,609.15) | 1.1759 | (94,785.83) |
| To credit you for lubes on-board on June 23, 2009 on re-delivery of vessel at end of charter. | (444.00) | 3.785 | (1,680.54) | 8.5660 | (14,395.51) |
| Total Off-hire Credit | | | | | (109,181.33) |
| Trico Marine Operators, Inc<br>Nordea Bank Finland Plc - New York Branch<br>437 Madison Avenue<br>New York, NY 10022<br>Swift NDEAUS3N<br>ABA/Routing# 026010786<br>Account#7414473001 | | Total Amount Due | | | (33,666.89) |

FOR AND ON BEHALF OF
TRICO MARINE OPERATORS, INC

CONTROLLER

# EXHIBIT 3

# Maritime Overseas

Pointe-Noire le 26 Octobre 2009

**CREDIT FONCIER DE MONACO**
11 Bd Albert 1ᵉʳ
98000 MONACO

De :     **Yves TERUIN**

A :     √ SᴬNEU

Objet : ORDRE DE VIREMENT Nº

Par le débit de notre compte en vos livres nº **221 96292 L**

Veuillez créditer le compte de :   **TRICO MARINE OPERATORS, Inc**

De la somme de USD :  **Deux cent vingt quatre mille euros (224 000.00 USD)**

En règlement de :   **Factures 113188**

BANQUE :     **Nordea Bank Finland Plc – New York Branch**
**437 Madison Avenue**
**New York NY 10022**
**Swift: NDEAUS3N / ABA Routing # 026010786**

COMPTE Nº :     **7414473001**

Sincères salutations.

**Yves TERUIN**

C.O. MORGAN Y MORGAN - Calle 53 Urbanizacione - Obario Torre Swiss Piso 16
PANAMA

# EXHIBIT 4



| 1. Place and Date | UNIFORM TIME CHARTER PARTY |
| Lagos, Nigeria, 6th of June, 2009 | FOR OFFSHORE SERVICE VESSELS |
| | CODE NAME: "SUPPLYTIME 89" |

PART I

| 2. Owners Place of business (full style, address and telex/telefax) | 3. Charterers/Place of business (full style, address and telex/telefax) |
| Trico Marine Operators Inc. 10001 Woodloch Forest Drive, Suite 610 The Woodlands, Texas 77380 | Ocean Express P.O Box 646 Pointe Noire Congo |
| [T] 281-203-5700 | |

| 4. Vessel's name (Cl. 1(a)) | 5. Date of delivery (Cl. 2(a)) | 6. Cancelling date (Cl. 2(a) and (c)) |
| OSV Big Blue RIVER | | As per Box 5 |
| | 7th of June 2009 | |

| 7. Port or place of delivery (Cl. 2(a)) | 8. Port or place of redelivery notice of redelivery (Cl. 2(d)) |
| Takoradi Ghana, Offshore clearances for Charters account. | Luba Equatorial Guinea, Offshore clearances for Charters account. |
| | (i) Port or place of redelivery |
| | 2 days |
| | (ii) Number of days' notice of redelivery |

| 9. Period of hire (Cl. 1(a)) | 10. Extension of period of hire (optional) (Cl. 1(a)) |
| Five (5) days firm | 3x1 day options |
| | (i) Period of extension |
| | (ii) Advance notice for declaration of option (days) |
| | 24 hours |

| 11. Automatic extension period to complete voyage or well (Cl. 1(c)) | 12. Mobilization charge (lump sum and when due) (Cl. 2(b)(i)) |
| N/A | (i) Lump sum    Nil. |
| (i) Voyage or well (state which) | |
| Voyage | |
| (ii) Maximum extension period (state number of days) | (ii) When due    Nil. |
| N/A | 13. Port or place of mobilization (Cl. 2(b)(i)) |
| | Takoradi, Ghana |

| 14. Early termination of charter (state amount of hire payable) (Cl. 26(a)) Any balance of the firm period outstanding at time of cancellation. | 15. Number of days' notice of early termination (Cl. 26(a)) N/A | 16. Demobilization charge (lump sum) (Cl. 2(e) and Cl 26(a)) N/A |

| 17. Area of operation (Cl. 5(a)) | 18. Employment of vessel restricted to (state nature of service(s)) (Cl. 5(a)) |
| Cargo run between Ghana and Equatorial Guinea. | General supplies as directed by Charterers but always within the classification and safe capacities/capabilities of vessel master and crew. |

continued



continued "SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels    PART I

| 19. Charter hire (state rate and currency) (Cl. 10(a) and (d)) | 20. Extension hire (if agreed, state rate) (Cl. 10(e)) |
|---|---|
| USD Six-Thousand-Five-hundred ($6,500) dollars per day | USD Six-Thousand-Five-hundred ($6,500) dollars per day |
| The above Charter rate is exclusive of withholding tax, fuel, lubes Fresh water and Charter are to provide and pay for VAT, local waivers, war premiums (if required), permits, any local crew communication, custom duties, port charges, harbour dues, clearances in and out, pilotage, agency fees, DGPS signal costs (if required) | As per Box 19. |

| 21. Invoicing for hire and other payments (Cl. 10(d)) | 22. Payments (state mode and place of payment, also state beneficiary and bank account) (Cl. 10(e)) |
|---|---|
| (i)       state whether to be issued in advance or arrears | |
| Charterer shall pay Charter hire and Bunkers in arrears within thirty (30) days from receipt of invoice and clear all outstanding disbursements with in five working (5) days before the termination of the firm period. | As per Owners invoices. |
| At the Off hire time theCharterer has to ensure a minimum quantity of 50,000 liters of fuel on board. Clause 9 applies | |
| (ii) state to whom to be issued if addressee other than stated in Box 2 | |
| (iii) state to whom to be issued if addressee other than stated in Box 3 | |

| 23. Payment of hire, bunker invoices and disbursements for Charterers account (state maximum number of days) (Cl. 10) | 24. Interest rate payable (Cl. 10(e)) | 25. Maximum audit period (Cl. 10(e)) |
|---|---|---|
| As per box 21. | 2% per Month | One (1) year |

| 26. Meals (state rate agreed) (Cl. 8(c)(ii)) | 27. Accommodation (state rate agreed) (Cl. 8(c)(ii)) | 28. Mutual Waiver of Recourse (optional, state whether applicable) (Cl. 12(f)) |
|---|---|---|
| $15 USD per meal per man | $25 USD per man per day | |

| 29. Sublet (state amount of daily increment to charter hire) (Cl. 17(b)) | 30. War (state name of countries) (Cl. 20(f)) |
|---|---|
| N.A | Ghana |

| 31. General average (place of settlement, only to be filled in if other than London) (Cl. 21) | 32. Breakdown (state periods) (Cl. 26(b)(i)) |
|---|---|
| N.A    (Cl. 21) | 3 consecutive hours |

| 33. Law and arbitration (state Cl. 31(a) or 31(b) or 31(c) as agreed; if Cl. 31(c) agreed also state place of arbitration) (Cl. 31) | 34. Numbers of additional clauses covering special provisions, if agreed |
|---|---|
| Cl. 31 (a) | See Clause 37, 38, 39 |

| 35. Names and addresses for notices and other communication required to be given by the Owners (Cl. 28) | 36. Names and addresses for notices and other communications required to be given by the Charterers (Cl. 28) |
|---|---|
| As per box 2 | As per box 3 |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in the Charter consisting of PART I including additional clauses if any agreed and stated in Box 34, and PART II as well as ANNEX "A" and ANNEX "B" as annexed to this Charter. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II and ANNEX "A" and ANNEX "B" to the extent of such conflict but not further than is original and shall only apply if expressly agreed and stated in Box 34.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| By: | OCEAN EXPRESS<br>B.P. 646 - POINTE-NOIRE<br>Tél (553-77 00)<br>REPUBLIQUE DU CONGO    N. Bigini<br>By: |
| Title: | Title: Deputy Managing Director |

Printed and sold by Fr. G. Knudtzon-Bogtrykkeri A/S, 55 Toldbodgade, DK-1253 Copenhagen K
by authority of the Baltic and International Maritime Council (BIMCO), Copenhagen.

# EXHIBIT 5

 

A D E P T   A T   A D A P T I N G

3200 Southwest Freeway Suite 2950 Houston, TX 77027 USA

Ocean Express
P.O. BOX 646
Pointe Noire
Congo.
Attention: Accounting Manager

**Invoice No.:** 113323
**Date:** July 2, 2009
**Ref:** "SUPPLYTIME 89"

| DESCRIPTION | | | | DAY RATE USD | USD AMOUNT |
|---|---|---|---|---|---|
| Services rendered in the month of June 2009 by the Big Blue River. | | | | | |
| From | 06:00 | Hours or | 8-Jun-09 | 6,500.00 | 28,708.36 |
| Through | 16:00 | Hours or | 12-Jun-09 | | |
| | 4.41667 | | | | |
| Maintenance Allowance for days worked in May (4.41667 days) | | | | | |
| | 0.14722 Days | | | 6,500.00 | 956.93 |
| Wire Instructions: Trico Marine Operators, Inc. Nordea Bank Finland Plc - New York Branch 437 Madison Avenue New York, NY 10022 Swift:NDEAUS3N ABA/Routing# 026010786 Account#7414473001 | | | | | |
| | | | | | 29,665.29 |

FOR AND ON BEHALF OF
TRICO MARINE OPERATORS, INC.

CONTROLLER

If any clarification is required, Please contact
Grace Esi - (234) 803 9740580 or by email gesi@cimis-wa.com
David Asher - (234) 805 7042872 or by email  dasher@cimstricomarine.com
Tel: 234-  462-0563/Fax 234-1-462-0564



 

ADEPT AT ADAPTING

9200 Southwest Freeway, Suite 2650 Houston, TX 77027 USA

Ocean Express
P.O. BOX 646
Pointe Noire
Congo.
Attention: Accounting Manager

**Invoice Number:** CM104712
**Date:** July 17, 2009
**Ref:**

| DESCRIPTION | USG | L/USG | LITRES | PRICE $/LITRE | TOTAL USD |
|---|---|---|---|---|---|
| Big Blue River charter commencing on June 8, 2009 | | | | | |
| To charge you for fuel on-board on June 8, 2009 on delivery of vessel at beginning of charter | 4,917.83 | 3.785 | 18,614.00 | 0.465659 | 8,667.78 |
| As per Qoutation of third party supplier attach<br>1MT = 540 USD<br>1MT = 1159 LITRES (SEE ATTACHED)<br>PRICE PER LITRE = $540/1159<br>0.465659 USD | | | | | |
| To charge you for lubes on-board on June 8, 2009 on delivery of vessel at beginning of charter. | 253.63 | 3.785 | 960 | 3.3000 | 3,168.00 |
| 1 Drum = 687.30 USD<br>1 Drum = 208 ltrs<br>1 Ltr = 687.30/208ltr<br>1 Ltr = 3.3043 | | | | | |
| Total On-hire Charges | | | | | 11,835.78 |
| To credit you for fuel on-board on June 12, 2009 on re-delivery of vessel at end of charter | (5,284.54) | 3.785 | (20,002.00) | 0.647109577 | (12,943.49) |
| 1MT = 750 USD<br>1MT = 1159 LITRES (SEE ATTACHED)<br>PRICE PER LITRE = $750/1159<br>0.647109577 | | | | | |
| To credit you for lubes on-board on June 12, 2009 on re-delivery of vessel at end of charter | (218.76) | 3.785 | (828.00) | 5.9848 | (4,955.41) |
| 1 Drum = 1196.96 USD<br>1 Ltr = 1196.96/200ltr<br>1 Ltr = 5.9848 | | | | | |
| Total Off-hire Credit | | | | | (17,898.90) |
| Net Amount Due | | | | | (6,063.12) |

FOR AND ON BEHALF OF
TRICO MARINE OPERATORS, INC.



CONTROLLER

If any clarification is required, Please contact
Grace Esii - (234) 803 5740560 or by email esii@cms-we.com
David Asher - (234) 805 7082672 or by email flasher@cms-we.com
Tel 234-1-462-0993/Fax 234-1-46 1064

